LEWIS AUDENRIED & others *vs.* ALBERT BETTELEY & others.

By a written instrument A. agreed to stock the wharves and yards of B. with coal, wood and bark, and to furnish B. with as much of the same as he could sell at retail, and pay him a specified price for doing the business, giving authority to B. to purchase such kinds and quantities of wood and bark as he might require. B. agreed not to sell or deal in any other coal, wood or bark than that furnished by A. or purchased on his account, and to guarantee the payment for all coal sold by him at retail, and to render to A. monthly accounts, and to credit A. with the same, as cash, at the price previously fixed upon by A. as the selling price, and to accept the drafts of A. for about the regular wholesale market price of similar coal. A. reserved the right to fix the price of coal from time to time, provided that the same should not be above the lowest market price, and it was stipulated that the books of B. should at all times be open to the inspection of A. *Held,* that the whole of the coal, wood and bark, together with the proceeds of such of it as had been sold, belonged to A.

An agency to sell merchandise for another is terminated by the agent's insolvency; and debts arising from sales made by the agent on credit, in his own name, belong to the principal, (subject to legal liens,) although, in pursuance of the agreement between the parties, the agent has rendered monthly accounts of all his sales, and given notes or acceptances to the principal for the cost of the merchandise at wholesale prices, taking a receipt, containing a promise to account for the same at maturity.

If the assignees in insolvency of an agent, who has sold merchandise for another in his own name, on credit, know that the principal claims the debts, and nevertheless proceed to collect them, they are not entitled to retain compensation for their own services, or for expenses incurred in good faith, in making the collection.

BILL IN EQUITY against Artemas Hammond, an insolvent debtor, and his assignees in insolvency, alleging, amongst other things, that said Hammond entered into a written agreement, under the name of A. Hammond & Co., to sell coal, wood and bark for the plaintiffs, and that, at the time of his insolvency, he had sold large quantities of the same for them, payment for which had been made to the other defendants, as his assignees ; and praying for a decree ordering the defendants to account for and pay over the sums collected by them, and to deliver the

books of Hammond to the plaintiffs, to enable them to collect such of the debts as are still outstanding.

The material portions of the written agreement were as follows :

" Memorandum of an agreement, made April 20, 1860, between A. Hammond & Co., of Boston, and Lewis Audenried & Co., of Boston and Philadelphia, which is to continue for two years from the first day of May next, viz :

" Lewis Audenried & Co. agree to stock the wharves and yards of A. Hammond & Co. with a full and sufficient supply of anthracite and bituminous coal, hard and soft wood, and bark, and to furnish said A. H. & Co. with as much of the same as they can sell at retail, and pay them ninety cents per ton of 2000 lbs., as specified below, for doing the business ; and A. H. & Co. to purchase such kind and quantities of wood and bark as they may require, and to account to L. A. & Co. for all sold monthly at cost price per cord, allowing L. A. & Co. all overrun in measure for their profit.

" L. A. & Co. agree to furnish A. H. & Co. with anthracite and Cumberland coal, to sell by the cargo or in larger quantities, at their current prices, and allow A. H. & Co. such commission as may be agreed upon from time to time as fair and equitable. . . . . . .

" A. H. & Co. agree not to sell or deal in any other coal, wood or bark, other than furnished by L. A. & Co., or purchased on their account, with their consent in writing ; and to devote their time and energies to carrying on vigorously and extensively the foregoing business ; and agree to receive, wharf, screen, sell, deliver and guarantee the payment of all coal sold by them at retail for ninety cents per ton of 2000 lbs., which shall cover all expenses and charges from the time said cargo is received from the vessels until delivered to the purchasers.

"A. H. & Co. agree to keep a strict account of all coal, wood and bark received and sold ; and, on the fourth day of every month, to render to L. A. & Co. a true and correct account of all sold up to and including the last day of the month preceding ; and to credit L. A. & Co. with the same, as cash, on that

date, at the price previously fixed upon by L. A. & Co. as their selling price.

"A. H. & Co. agree to accept the drafts of L. A. & Co., on four months, for about the regular wholesale market price for similar coal, on the receipt of bills of lading; and, should they not be in funds to pay the freight on said coal as it is received, they shall, if L. A. & Co. request it, give their acceptances on such times as shall be agreed upon, not exceeding four months, for the amount of such profit; and, should they not be in funds from sales when such notes fall due, they are to be renewed until such times as they are in funds.

"A regular interest account shall be kept between the parties, L. A. & Co. to be debited with interest on all moneys paid by A. H. & Co. for freights or acceptances given for coal from the time such payments are made; and A. H. & Co. to be debited by L. A. & Co. with interest from the first day of every month for the coal, &c., sold the previous month. Should A. H. & Co. advance on freight or on coal more money than they are in receipt of from the sale of coal, they shall receive interest on the same; and should they receive money for the sales of coal faster than is required for the payment of freight and acceptances given on account of coal, they shall have the privilege of paying it over to L. A. & Co., thereby saving interest.

" L. A. & Co. reserve the right to fix the price of coal from time to time, both at retail and wholesale, provided the price so fixed shall not be above the lowest market price selling at the time; and A. H. & Co. agree to sell no more coal ahead than they can deliver in one week, without the written consent of L. A. & Co.

"A. H. & Co.'s books, accounts, &c., to be open to the inspection and examination of L. A. & Co. at all times. The quantity of coal, wood, &c., on A. H. & Co.'s wharves, on the first day of May next, to be estimated by ourselves, if mutually agreed; but, if not, then by three disinterested persons, and taken by L. A. & Co. at the market price for a similar quality on said day.

"All coal at the risk of L. A. & Co. until it arrives at the

wharf where it is to be discharged; and L. A. & Co. authorize A. H. & Co. to effect insurance for a reasonable amount on the stock of coal on their wharves, payable to A. H. & Co. in case of loss."

After the former decision in this case, (5 Allen, 382,) the case was referred to a master, to find and report the facts in relation to the alleged subsequent parol agreement, and to state and report an account between the parties; and he reported the following facts:

" In pursuance of this contract, the plaintiffs from time to time furnished Hammond with coal, and Hammond purchased for them wood and bark. He made sales of the coal, wood and bark; and rendered to them monthly accounts of these sales, including sales made on credit as well as sales made for cash.

" Hammond, in books kept in his own name, entered all sales of coal, wood and bark, and charged to the purchasers those which were made on credit. He accepted the drafts of the plaintiffs, or gave them his notes, amounting in the aggregate to the cost of the coal at wholesale prices; taking their receipt for each draft or note, in which they promised to account for the same at maturity. Whenever he paid a note or draft, the amount thereof was put to his credit in the monthly account which he rendered. The notes and drafts which he did not pay, amounting in all to $15,982.54, the plaintiffs produced and offered to surrender. At their request, they are filed with this report.

" When Hammond applied for the benefit of the insolvent act, there was due from him to the plaintiffs, for sales of coal, wood and bark under the contract, the sum of $6732.90. The coal which remained on hand was appraised at $9052, and was taken from the assignees on a writ of replevin.

" Betteley and Sawyer, at the time of their appointment as assignees, were aware that the plaintiffs claimed the book debts and coal as their property. On the 26th day of July 1861, the plaintiffs demanded of the assignees the books aforesaid, or an opportunity to examine and take copies of them.

" The assignees have collected of these debts $4606.03. And

they now have gas stock to the amount of $100.51, and two due-bills, amounting together to $90.99, taken in settlement of some of the debts. Many of the debts are not yet collected. Of the money collected, a part, viz., $547.03, was received by the assignees before the 26th day of July aforesaid. The assignees placed some of the demands in the hands of an attorney for collection. He made collections to the amount of $696.28, and charged for his services $350. These charges the assignees, in good faith, allowed and paid. The assignees claim to have allowed to them the money so expended, and compensation for their trouble in making other collections. I find that a commission of eight per cent. on the entire amount collected would be a reasonable compensation for making the collections, if the court should be of opinion that, upon the facts, they are entitled to any. There was no evidence offered of any subsequent parol agreement."

The parties also agreed that monthly accounts were rendered by Hammond to the plaintiffs, on one side of which was placed in one sum the net amount of the sales of the preceding month, and on the other the payments made by him during that month, for freight, insurance, purchase of wood and bark, and of such kinds of coal as were not furnished by the plaintiffs, including such notes or drafts as had been paid by him. The balance of each account thus made up was carried forward into the next account. No interest account was ever made up or stated upon the items in these accounts, and no settlement was ever made or attempted to be made upon them. Copies of these accounts were annexed, by which it appeared that, by the account for December 1860, the balance against Hammond, as there stated, was $83.71.

The case was reserved by the chief justice for the determination of the whole court.

*S. Bartlett & D. Thaxter*, for the plaintiffs, cited Story on Agency, §§ 112, 401, 420, 424; *Barry v. Page*, 10 Gray, 398 *Scott v. Surman*, Willes, 400, 405 ; *Garrat v. Cullum*, Bul. N. P 42 ; *Hudson v. Granger*, 5 B. & Ald. 27, 32–34.

*J. G. Abbott & G. A. Somerby*, for the defendants. 1. The

defendants are not liable at all for moneys collected by them. Taking the whole contract together, it was the intention to permit Hammond to sell coal, &c., and account for it at a certain price fixed by the plaintiffs, for which price he would be responsible as cash. It was not a sale upon commission, as ordinarily understood and practised. The whole business was done in the name of Hammond; he could sell in his own name, on credit or for cash, and was to give notes or acceptances for the amount agreed upon, which operated as a settlement. 2. In any event, the assignees should be allowed their commissions and expenses in making the collections.

Hoar, J. When this cause was before us at an earlier stage, we supposed the legal effect of the contract between the plaintiffs and Hammond not to be in dispute. 5 Allen, 382. But, if it were open for discussion, it is very plain that under it the whole of the coal, wood and bark on the wharves and yards of Hammond was the property of the plaintiffs, and that Hammond was to carry on the business as their agent or factor. Such is the whole scope of the contract, and there are several specific provisions which it is impossible to reconcile with any other construction. Thus the plaintiffs agree to stock the wharves and yards with a full supply of coal, wood and bark, and to pay Hammond a fixed sum per ton " for doing the business." Hammond agrees not to sell or deal in any other coal, wood or bark than that furnished by the plaintiffs, " or purchased on their account, with their consent in writing ; " and to " guarantee the payment of all coal sold by them [Hammond & Co.] at retail for ninety cents per ton, which shall cover all expenses and charges." All the coal, wood, &c., on hand at the time the contract took effect was to be estimated and appraised, and " taken " by the plaintiffs " at the market price." But most decisive of all is the agreement that the plaintiffs " reserve the right to fix the price of coal from time to time, both at retail and wholesale, provided the price so fixed shall not be above the lowest market price selling at the time." They may require it to be sold at as low a rate as they choose, which would be a strange stipulation in respect to the property of another.

The agency of Hammond was terminated by his insolvency; and the property remaining, and the proceeds of such parts of it as had been sold, were the property of the plaintiffs, and subject to their disposal, unless their agent had some lien upon it which would pass to the assignees. *Scott* v. *Surman*, Willes, 400. The defendants, as assignees in insolvency, assumed no personal obligation in respect to the execution of the contract; and its provisions had been violated by Hammond, so that the plaintiffs were entitled to reclaim the property itself for their security. The fact that by the contract Hammond was to guarantee the sales gave the defendants no title to the proceeds of the property sold, unless where the amount due upon any specific sale had been accounted for to the plaintiffs, and the amount due upon it paid over to them. It appears that a great many sales have been entered upon the accounts rendered from month to month before the insolvency. But no interest account has been computed or adjusted; the balance appearing due has been regularly carried forward in account from one month to another; and we can see no evidence of any intent of the parties to treat the debts as transferred to the agent. There was, in fact, only a statement, and not a settlement of accounts.

The only other point requiring notice is the payment by the defendants of the expenses of collecting some of the debts. These payments having been made, and the collections having been made, after full notice that the plaintiffs claimed the books and accounts as their property, although made in good faith, were made in violation of the plaintiffs' rights. The defendants have therefore no claim for compensation or commissions.

*Decree for the plaintiffs.*